IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

PRISCILLA O. GAULT                                                    PLAINTIFF

                    v.                      Civil No. 10-3050

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                        DEFENDANT

**MEMORANDUM OPINION**

I.      **Procedural Background**

        Pursuant to §42 U.S.C. 405(g), Priscilla O. Gault ("Plaintiff") appeals to this Court from the

decision of the Commissioner of the Social Security Administration denying her application for

supplemental security income benefits ("SSI").

        Plaintiff protectively filed her SSI application on June 24, 2004, alleging a disability onset

date of March 24, 2003, due to interstitial cystitis ("IC"), migraines, gastroesophageal reflux disease

("GERD"), hypothyroidism, thrombocytosis, depression, irritable bowel syndrome ("IBS"), and

anxiety.  Tr.11, 59, 67, 110.  At the time of the application date, Plaintiff was forty five (45) years

old with a high school equivalency degree.  Tr. 21, 65, 67, 441, 484.  She has past relevant work as

a medical billing clerk.  Tr. 21, 70-75, 122, 441, 481-484, 500.

        Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 27-29, 31-32.

At Plaintiff's request, an administrative hearing was held on January 17, 2007.  Tr. 474-501.

Plaintiff was present at this hearing and represented by counsel. Tr. 474-501.  The ALJ rendered an

unfavorable decision on November 14, 2007, finding that Plaintiff was not disabled within the

meaning of the Social Security Act.  Tr. 8-22.  Subsequently, Plaintiff submitted new evidence to

the Appeals Council.  Tr. 6.  The Appeals Council reviewed the newly submitted evidence, but determined there was no basis for changing the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  Tr. 3-6.  Plaintiff now seeks judicial review of that decision.

## II.    <u>Factual Background</u>

Plaintiff has a history of chronic migraines, high blood platelets, hypothyroidism, GERD, depression, and IC.  Tr. 165-185, 355-439.  From 2002-2004, Plaintiff saw Molly A. Moore, a nurse practitioner, for routine care of various impairments, including GERD, migraines, an upper respiratory infection, elevated liver functioning, IBS, tennis elbow/epicondylitis, hypothyroidism, and anxiety.  Tr. 202-220.  Plaintiff was prescribed Nexium for GERD, Fioricet for headaches, and Synthroid for thyroid function.  Tr. 208, 212.

In March 2003, Plaintiff was referred to James C. Cord, M.D., for recurrent urinary tract infections.  Tr. 127-130.  Dr. McCord noted that a recent CT scan of the abdomen and pelvis, dated February 6, 2003, did not show any signs of kidney pathology, hydronephrosis, or stones, and Plaintiff's bladder and ureters were normal.  Tr. 129, 163-164, 339.  On examination, Dr. McCord noted that Plaintiff's bladder was non-distended and she had a normal urethral structure with good support.  Tr. 130.  Plaintiff was given samples of Prosed/DS.  Tr. 130.  On March 13, 2003, Plaintiff underwent a cystoscopy to evaluate her bladder.  Tr. 128.  Findings revealed normal urethral orifices and a normal urethra, with no signs of tumors, stones, polyps, or significant inflammation.  Tr. 128. Dr. McCord started Plaintiff on Detrol LA and Elmiron for bladder spasms and pain.  Tr. 128.  On April 24, 2003, he noted that Plaintiff's chronic bladder pain was consistent with IC.  Tr. 127.  He discussed potential treatment options, including anticholinergic medication, pain medication, and hydrodistension.  Tr. 127.

-2-

In 2003 and 2004, Plaintiff was treated by Elizabeth A. Kornfield, M.D., for bladder and low back pain.  Tr. 196-198.  In June 2003, Dr. Kornfield noted that Plaintiff's pelvic pain and urgency/frequency were consistent with IC.  Tr. 193.  On examination, Plaintiff was notable for tenderness of the pelvic floor musculature and significant tenderness of the bladder base.  Tr. 198. Her urinalysis was negative.  Tr. 198.  Dr. Kornfield suggested continuing Elmiron and added Elavil and Neurontin.  Tr. 198.  At a follow-up appointment in September 2003, Dr. Kornfield noted that Plaintiff was doing "much better" on the combination of Neurontin, Elavil, and Elmiron, and her pain had significantly decreased.  Tr. 198.  Plaintiff still reported some intermittent urgency, but stated it was fairly minimal compared to her prior episodes.  Tr. 198.  In June 2004, Dr. Kornfield discussed bilateral instillation therapy, but Plaintiff did not want to learn how to catheterize herself. Tr. 196.  Dr. Kornfield increased Plaintiff's dosage of Neurontin and gave her samples of Urelle. Tr. 196.

In December 2003, Plaintiff presented to Banner Health Center with complaints of bloating, fatty food intolerance, and chronic acid reflux despite the use of proton pump inhibitors.  Tr. 188-189.  Luis Coppelli, M.D., recommended a gallbladder ultrasound and an esophagogastroduodenscopy ("EGD").  An ultrasound of Plaintiff's abdomen, dated December 8, 2003, revealed a normal gallbladder and normal kidneys, without evidence of mass, hydronephrosis, or stone.  Tr. 135, 149.  On January 20, 2004, Plaintiff underwent an EGD for evaluation of GERD. Tr. 131-133.  Results were consistent with mild gastritis and moderate reflux esophagitis, but there was no evidence of hiatal hernia and no H.pylori organisms were identified.  Tr. 131-133.  Plaintiff was instructed on diet and prescribed Nexium.  Tr. 131, 180.

-3-

In early 2004, Plaintiff saw Charles T. Crinnian, M.D., for chronic migraines with nausea, vomiting, and photophobia.  Tr. 191-195.  An MRI of Plaintiff's brain, dated April 24, 2003, was negative.  Tr. 155.  Dr. Crinnian noted that Maxalt had been effective in treating Plaintiff's headaches in the past.  Tr. 193.  Plaintiff also reported that her headaches had improved on Neurontin. Tr. 193. On examination, Plaintiff was neurologically intact.  Tr. 191.  Her blood tests revealed slightly elevated liver functions, but were otherwise normal.  Tr. 191, 204.  Dr. Crinnian found that Plaintiff's significant exposure to analgesics/anti-inflammatories had created a transformed migraine, otherwise known as a chronic daily headache.  Tr. 194.  Dr. Crinnian increased Plaintiff's dosage of Elavil and prescribed Maxalt for severe headaches.  Tr. 191, 194.  He also instructed Plaintiff to discontinue the use of Fioricet and to take an over-the-counter magnesium supplement.  Tr. 194.  On March 22, 2004, she reported that Maxalt had been effective in treating her migraines.  Tr. 191.

From July 2004 through January 2007, Plaintiff was treated at Gainesville Medical Clinic for low back pain, depression, anxiety, thrombocytosis, hypertension, IC, hypothyroidism, and migraines.  Tr. 221-244, 263-290, 302-337.  Plaintiff was prescribed various medications for her impairments, including Zoloft, Cymbalta, Elavil, Soma, Atarax, Nexium, Toprol, Urispas, Toradol, Hydrocodone/APAP, Elmiron, Neurontin, Synthroid, and Avalide.  Tr. 221-244.  Plaintiff's thyroid levels varied, requiring several adjustments to her Synthroid medication.  Tr. 238.

On August 28, 2004, Katherine Darling, a family nurse practitioner at Gainesville Medical Clinic, submitted a Treating Physician's Report concerning Plaintiff's migraines.  Tr. 199.  Ms. Darling indicated that Plaintiff experienced continuous headaches five out of seven days a week and her pain level ranged from a four to a ten, occasionally requiring a trip to the emergency room.  Tr.

-4-

199.  She stated that Plaintiff used Inderal, Maxalt, and Lortab for headaches, with some decrease in pain.  Tr. 199.  Ms. Darling noted that Plaintiff experienced headaches with photophobia, which required bed rest and darkness.  Tr. 199.

On August 31, 2004, Plaintiff saw R. Bruce White, M.D., for her elevated platelet count/thrombocytosis and slightly elevated white count.  Tr. 200-201.  Dr. White noted that Plaintiff's platelet count was 500,000 and her white cell count was 13,000.  Tr. 201.  After performing a peripheral smear, Dr. White assessed Plaintiff with probable reactive thrombocytosis and reactive leukocytosis secondary to chronic inflammation, which was consistent with her IC.  Tr. 201.  Dr. White recommended a lose dose of aspirin for Plaintiff's elevated platelet count and urged her to establish care with a urologist.  Tr. 201.

In a Physical Residual Functional Capacity ("RFC") Assessment dated October 27, 2004, Robert M. Redd, M.D., reviewed Plaintiff's medical records and determined she could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk/sit for about 6 hours in an 8-hour workday, and push/pull an unlimited amount, other than as shown for lift/carry.  Tr. 250-258.  Dr. Redd found no postural, manipulative, visual, or communicative limitations, but determined Plaintiff must avoid all exposure to hazards, including driving, secondary to migraine headaches.  Tr. 250-254.  On March 17, 2005, Steve Owens, M.D., reviewed and affirmed Dr. Redd's assessment.  Tr. 258.

Plaintiff was referred at Ozarks Medical Center for her elevated platelet count.  Tr. 245-249.  On January 12, 2005, Charles Morgan, M.D., reviewed Plaintiff's November 2004 blood work and noted that her hemoglobin level was slightly low, her white cell count was normal, and her platelet count had increased slightly to 568,000.  Tr. 245.  A blood smear showed nonspecific changes and

a moderate degree of rouleaux formation.  Tr. 245.  Dr. Morgan found that Plaintiff's thrombocytosis could be reactive, but he could not rule of myeloproliferative disorder.  Tr. 247.  He ordered further testing and noted that the best approach might be to continue taking aspirin with regular monitoring of Plaintiff's blood counts.  Tr. 247.

In May 2006, Plaintiff presented to Mountain Home Christian Clinic with complaints of IC and elevated platelets.  Tr. 296-301.  Plaintiff's blood count revealed high platelet and thyroid levels.  Tr. 301.  On May 15, 2006, Paul Wilbur, M.D., increased Plaintiff's dosage of Synthroid to 150mcg.  Tr. 297.  In June 2006, Plaintiff stated that Fioricet was effective in treating her migraines.  Tr. 303-304.  Blood count testing revealed a normal thyroid level.  Tr. 325.  However, Plaintiff's platelet count remained high.  Tr. 335.

On February 5, 2007, at her attorney's request, Plaintiff went to a consultative neuropsychological evaluation performed by Vann A. Smith, Ph.D.  Tr. 441-449.  Plaintiff denied any head trauma, but stated she was repeatedly exposed to environmental neurotoxicants while working in her husband's painting business.  Tr. 441.  On examination, Plaintiff was alert and oriented in all spheres, but her memory was impaired.  Tr. 442.  Her judgment and insight were grossly intact and her narratives were fluent, logical, and informative, without evidence of associational anomaly.  Tr. 442.  Plaintiff denied suicidal or homicidal ideation.  Tr. 442.  Her gait was slow and hesitant and her posture was guarded and rigid with frequent positional changes.  Tr. 442.

On the Wechsler Adult Intelligence Scale, Revised, Plaintiff received a verbal IQ score of 96, a performance IQ score of 102, and a full-scale IQ score of 98, which was within the average range of functioning.  Tr. 442.  Dr. Smith diagnosed Plaintiff with cognitive dysfunction, non-

psychotic, secondary to general medical condition.  Tr. 445.  In a Mental RFC Questionnaire, Dr.

Smith determined  that Plaintiff was unable to meet competitive standards in eleven work-related

categories, was seriously limited, but not precluded, in six work-related categories, and was limited,

but satisfactory, in eight work-related categories.  Tr. 447-448.  He also determined Plaintiff would

miss more than four workdays per month.  Tr. 448.

On March 3, 2007, Plaintiff attended one session at Ozark Counseling Services. Tr. 451-456.

She had no prior history of mental health treatment, but complained of chronic anxiety due to

financial problems and health.  Tr. 455.  On examination, Plaintiff had racing thoughts and appeared

anxious, but she was cooperative.  Tr. 454.  Her memory was slightly impaired and her judgment and

insight were fair.  Tr. 454.  Plaintiff's intelligence was estimated to be within the average range.  Tr.

454.  She was assessed with anxiety disorder not otherwise specified and given a GAF score of 60.

Tr. 456.  She was discharged from treatment for failing to return after her initial appointment.  Tr.

451.

On July 9, 2007, Plaintiff underwent a consultative neuropsychological examination

performed by Stephen R. Harris, Ph.D.  Tr. 457-467.  She reported a history of anxiety and

depression.  Tr. 458-459.  Plaintiff had previously taken Cymbalta for depression, but stated she

could no longer afford it.  Tr. 459.  On examination, Plaintiff was alert and oriented times four.  Tr.

460.  She was pleasant but anxious and showed a good bit of movement during the evaluation.  Tr.

459.  Her mood and affect were appropriate.  Tr. 459.  Her thought processes were spontaneous,

logical, and well-organized.  Tr. 460.  She had a relatively positive self-concept.  Tr. 460.  She

admitted passive suicidal ideation, but denied prior attempts.  Tr. 460.  Her current medications

included Elmiron, Elavil, Neurontin, Flavoxate, Synthroid, Atarax, Inderal, Soma, Avalide, Fioricet,

Ativan, potassium, Zantac, and Ecotrin. Tr. 463. When asked about her hobbies, Plaintiff stated she read a lot and would like to paint. Tr. 460.

Dr. Harris estimated Plaintiff's intelligence to be within the average range. Tr. 461. On the Luria-Nebraska Neuropsychological Battery, Plaintiff received a critical score of 61.33. Tr. 461. Her memory scale revealed a mild deficit in memory tasks, which was consistent with some of the findings of Dr. Smith. Tr. 461. Dr. Harris diagnosed Plaintiff with anxiety disorder not otherwise specified, pain disorder with both psychological and physical basis, and cognitive dysfunction (mild). Tr. 461. In Axis II, he found probable personality disorder. Tr. 461. He estimated Plaintiff's GAF score at 57. Tr. 461. Dr. Harris found that Plaintiff had some difficulty with social interaction and appeared very dependent on others. Tr. 462. He also noted some difficulty in coping with work-like tasks due to perceptions concerning her physical problems and difficulty with attention and memory. Tr. 462. He found no difficulties in persistence, but determined Plaintiff would have difficulty performing work-like tasks within an acceptable time frame. Tr. 462. Dr. Harris noted that Plaintiff was open and honest during the evaluation, but seemed to emphasize her pain and physical difficulties. Tr. 462.

In a Medical Source Statement (Mental), Dr. Harris found moderate limitation in Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting, mild to moderate limitation in Plaintiff's ability to interact appropriately with the public, supervisors, and co-workers, and mild limitation in Plaintiff's ability to make judgments on simple work-related decisions, understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. Tr. 465-466. He found no limitation in Plaintiff's ability to understand, remember, and carry out simple instructions. Tr. 465.

Plaintiff submitted additional evidence to the Appeals Council. Tr. 6, 470-472. A July 2008 MRI of Plaintiff's lumbar spine revealed degenerative changes at L5-S1 with a symmetric bulging disc causing moderate central and moderate bilateral neural foraminal narrowing and significant degenerative changes in the L5-S1 facets on the right. Tr. 472. On July 29, 2008, Plaintiff had CTs of her chest, abdomen, and pelvis performed. Tr. 470. Findings revealed right nephrolithiasis/kidney stones without hydronephrosis and a fatty liver, but no suspicious masses were noted. Tr. 470-471.

Plaintiff also submitted a letter from Dr. Kornfield, dated May 8, 2008, which stated that Plaintiff's main IC symptoms included bladder spasms, urinary urgency and frequency, and pelvic pain. Tr. 502. Plaintiff's medications included Elmiron, Elavil, and Neurontin. Tr. 502. Dr. Kornfield also gave Plaintiff samples of additional medication "to try to slow her bladder down." Tr. 502. Dr. Kornfield noted that Urispas had been reasonably effective in the past. Tr. 502. She opined that Plaintiff condition required close monitoring. Tr. 502.

## III.   Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it

is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits her physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform her past relevant work; and (5) if the claimant cannot perform her past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given her age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

IV.   **Discussion**

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since June 24, 2004, the application date. Tr. 13. At step two, the ALJ found that Plaintiff suffered from IC, recurrent migraine headaches, hypertension, hypothyroidism, GERD, thrombocytosis, anxiety

disorder not otherwise specified, pain disorder with both psychological and physical basis, mild cognitive dysfunction, and probable borderline personality disorder with a GAF of 57, which were considered severe impairments under the Act. Tr. 13-17. At step three, he determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 17-18. At step four, the ALJ found that Plaintiff had the RFC to lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk/sit for 6 hours in an 8-hour workday, and must avoid hazards such as heights and moving machinery. Tr. 18-20. Additionally, the ALJ determined Plaintiff was mildly limited in the ability to make judgments on simple work-related decisions, understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions, and moderately limited in the ability to interact appropriately with supervisors, co-workers, and the public, and respond appropriately to usual work situations and routine work changes. Tr. 18-20.

After eliciting testimony from a vocational expert, the ALJ determined there were sedentary, semi-skilled jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as data entry clerk, of which there are 258,000 jobs nationally and 1,700 jobs locally, clerk-typist, of which there are 72,000 jobs nationally and 500 jobs locally, and check cashier, of which there are 651,000 jobs nationally and 6,600 jobs locally. Tr. 21-22. Alternatively, the ALJ found that Plaintiff could perform light, unskilled jobs such as cashier, of which there are 960,000 jobs nationally and 9,700 jobs locally, hand packager, of which there are 207,000 jobs nationally and 2,000 jobs locally, and mail clerk, of which there are 79,000 jobs nationally and 500 jobs locally. Tr. 21-22. Accordingly, the ALJ determined Plaintiff had not been under a disability, as defined by the Social Security Act, at any point from June 24, 2004, the

application date, through November 14, 2007.  Tr. 22.

Plaintiff contends the ALJ erred by: (1) incorrectly determining her RFC; (2) posing an improper hypothetical question to the vocational expert; and (3) failing to consider her subjective complaints of pain.  *See* Pl.'s Br. 12-20.

**A.  RFC Assessment**

Plaintiff argues that the ALJ erred in determining her RFC.  *See* Pl.'s Br. 9-14.  Specifically, Plaintiff alleges the ALJ failed to properly consider the opinions of her treating and examining physicians.  *See* Pl.'s Br. 12-15.  This Court disagrees.

At the fourth step of the evaluation, a disability claimant has the burden of establishing her RFC.  *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  A claimant's RFC is the most she can do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question."  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination.  *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

1. Physical Impairments

None of the medical evidence of record supports Plaintiff's contention that she is totally disabled.  Following being diagnosed with IC, Plaintiff was prescribed Elmiron, Elavil, and Neurontin.  Tr. 198.  In September 2003, Plaintiff reported that she was doing "much better" and her

pain had significantly decreased.  Tr. 198; *see Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (an impairment that can be controlled with treatment cannot be considered disabling).  After a flare-up associated with Plaintiff's recent relocation, Dr. Kornfield discussed the possibility of bilateral instillation therapy, but Plaintiff did not want to learn how to catheterize herself.  Tr. 196; *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (claimant did not follow recommended course of treatment).

Additionally, the ALJ did not err in his analysis of Plaintiff's alleged migraines.  The medical evidence of record reveals that Plaintiff experienced migraines requiring frequent treatment and dosage adjustments.  Plaintiff's neurologist, Dr. Crinnian, found that her migraines were caused by significant exposure to analgesics/anti-inflammatories, which had created a transformed migraine, otherwise known as a chronic daily headache.  Tr. 194.  He instructed Plaintiff to discontinue the use of Fioricet and to take an over-the-counter magnesium supplement.  Tr. 194.  He also prescribed Maxalt, which Plaintiff reported was effectively treating her migraines.  Tr. 194; *Olsen v. Apfel*, 2 Fed. Appx. 642, 644 (8th Cir. 2001) (claimant's symptoms improved with treatment).  However, contrary to Dr. Crinnian's advice, Plaintiff reported in June 2006 that Fioricet was helpful for her migraines and received a prescription from Gainesville Medical Clinic.  Tr. 303-304; *Holley*, 253 F.3d at 1092.  Plaintiff's noncompliance with Dr. Crinnian's recommendations weighs against her allegations of disabling migraines.

Plaintiff directs the Court's attention to the August 24, 2004, letter completed by Katherine Darling, a nurse practitioner.  *See* Pl.'s Br. 5, 14-15.  Ms. Darling completed a Treating Physician's Report, in which she indicated that Plaintiff experiences continuous headaches five out of seven days a week and her pain levels occasionally require a trip to the emergency room.  Tr. 199.  She further

stated that medication provided some relief, but Plaintiff's pain rarely resolved.  Tr. 199.  Ms.
Darling noted that Plaintiff's migraines required bed rest and darkness.  Tr. 199.

Despite Plaintiff's contention, Ms. Darling is not a treating physician and is not considered
an acceptable medical source.  20 C.F.R. § 416.913.  As "other source" evidence, Ms. Darling's
opinion is helpful for determining the severity of Plaintiff's migraines and how they affect her ability
to work.  *Id.*  However, her findings appear to be based on Plaintiff's subjective complaints rather
than objective findings.  *See Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (physician's
medical source statement was based on claimant's subjective complaints rather than objective or
clinical findings).  Moreover, Plaintiff first began treatment at Gainesville Medical Clinic on July
22, 2004, and Ms. Darling's letter was written only one month later.  Tr. 230-232.  As such, it does
not appear that a significant clinical relationship had been established.

Plaintiff also argues that the ALJ should have sought input from "Dr. Darling-Pope or Dr.
Moore."  *See* Pl.'s Br. 14-15.  However, these individuals are nurse practitioners, not treating
physicians.  Moreover, the ALJ had sufficient evidence to form Plaintiff's RFC.  *See Tellez v.
Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005) (rejecting argument that ALJ failed to fully and
fairly develop the record where there was no indication that the ALJ was unable to make RFC
assessment).  As such, Plaintiff's argument is without merit.

None of Plaintiff's remaining impairments are of disabling severity.  The medical evidence
shows that Plaintiff's GERD is controlled with proton pump inhibitors.  An EGD revealed mild
gastritis and moderate reflux esophagitis, but there was no evidence of hiatal hernia or H.pylori
organisms.  Tr. 131-133.  Plaintiff was instructed on diet and treated with Nexium.  Tr. 131, 180.
Additionally, although Plaintiff's hypothyroidism caused problems with weight gain, she was

-14-

effectively treated with Synthroid and regular monitoring of her thyroid levels.   In June 2006, Plaintiff's thyroid level was within the normal range.   Tr. 325.

Similarly, Plaintiff's elevated platelet count/thrombocytosis was conservatively treated with aspirin and regular monitoring of her blood counts.  Tr. 247; *see Owens v. Barnhart*, 109 Fed. Appx. 825, 826 (8th Cir. 2004) (claimant's shoulder injury was diagnosed and treated conservatively). Although these impairments undoubtedly cause some pain and discomfort, the medical evidence simply does not establish that they are of disabling severity.

2.   Mental Impairments

The Court finds that substantial evidence supports his mental RFC findings.   In making his mental RFC determination, the ALJ adopted the findings of Dr. Harris.   Plaintiff alleges this was error.   *See* Pl.'s Br.

It is the ALJ's function to resolve conflicts among various treating and examining physicians, so it was well within the ALJ's discretion to credit Dr. Harris' opinion over Dr. Smith's opinion. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).   Dr. Smith was not a treating physician, and, as such, was entitled to no special deference.   Additionally, Dr. Harris' opinion was better supported by the evidence of record.  An April 2003 MRI of Plaintiff's brain was negative.  Tr. 155.  Moreover, Plaintiff's IQ scores indicated that she functioned within the average range of intelligence.   Tr. 442. Results of the Luria-Nebraska Neuropsychological Battery revealed a mild deficit in memory tasks consistent with *mild* cognitive dysfunction.   Tr. 461.   Therefore, objective testing simply did not corroborate Dr. Smith's opinion that Plaintiff's cognitive dysfunction was disabling. Although the ALJ did not explicitly discount Dr. Smith's opinion, he adequately discussed both Dr. Smith and Dr. Harris' findings and ultimately concluded that Plaintiff's cognitive disorder was not disabling.

Additionally, although Plaintiff complained of chronic depression, she only attended one therapy session at Ozark Counseling Services and was discharged for failing to attend her appointments.  Tr. 20, 452-456; *see Kirby v. Astrue*, 500 F.3d 705, 708-09 (8th Cir. 2007) (claimant had not sought formal treatment by a psychiatrist, psychologist, or other mental health care professional).  For these reasons, the Court finds no error in the ALJ's mental RFC determination.

### 3. Additional Evidence

Plaintiff submitted a letter from Dr. Kornfield, a CT of her abdomen, and an MRI of her lumbar spine to the Appeals Council, which were made a part of the administrative record.[1]  Tr. 6, 470-472A, 502.  Dr. Kornfield's letter discusses the effects of IC, including bladder spasms, urinary frequency/urgency, and pelvic pain, and the different medications Plaintiff has taken.  Tr. 502.  However, Dr. Kornfield did not discuss any functional limitations resulting from IC or offer an opinion on potential work-related difficulties.  As such, the court finds that Dr. Kornfield's letter adds little to the medical evidence of record.  Similarly, Plaintiff's CT results show a fatty liver and a right nephrolithiasis without hydronephrosis.  Tr. 470-471.  However, kidney stones are not uncommon and there is no indication that this condition required any medical intervention.  Finally, the MRI of Plaintiff's lumbar spine does not relate to an impairment she claimed either initially or at the administrative hearing.  *See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (ALJ need not investigate impairment that claimant does not cite in application or offer as a basis for disability at hearing).  Therefore, after considering the evidence of record, including the evidence submitted

---

[1] If a claimant's submits additional evidence to the Appeals Council, the court does not evaluate the Appeals Council's decision to deny review.  Instead, the court's role is limited to deciding whether the ALJ's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.  *See, e.g., Nelson,* 966 F.2d at 366, and *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992).

to the Appeals Council, the court concludes that substantial evidence supports the ALJ's decision.

### B. <u>Vocational Expert Testimony</u>

Plaintiff argues that the ALJ's hypothetical question did not accurately reflect her limitations. *See* Pl.'s Br. 15-16. However, this section of Plaintiff's brief simply reiterates her prior RFC argument.

A hypothetical question posed to the VE is sufficient if it sets forth impairments supported by substantial evidence and accepted as true by the ALJ. *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (citing *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)). Here, the ALJ's hypothetical to the VE was proper, as it mirrored the limitations adopted by the ALJ. *Roe v. Chater*, 92 F.3d 672, 676 (8th Cir. 1996). The ALJ may properly exclude, as he did in this instance, any alleged limitation or impairments he rejects as untrue or unsubstantiated. *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). For these reasons, Plaintiff's argument is without merit. Accordingly, substantial evidence supports the ALJ's hypothetical question.

### C. <u>Subjective Complaints</u>

Plaintiff alleges the ALJ improperly dismissed her subjective complaints. *See* Pl.'s Br. 14-18. When evaluating a claimant's subjective allegations, the ALJ must consider all evidence relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) any precipitating and aggravating factors; (4) the dosage, effectiveness and side effects of medication; and (5) any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ "may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *Medhaug v.* Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (quoting *Goff*, 421 F.3d at 792). However, subjective complaints may be discounted if there

are inconsistencies in the medical evidence as a whole. *Id.* A court "will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain." *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (quoting *Goff*, 421 F.3d at 792).

Contrary to Plaintiff's assertion, the ALJ properly considered her subjective complaints and dismissed them for legally sufficient reasons. The ALJ cited the lack of objective medical corroboration as evidence that her limitations were not of disabling severity. Tr. 20; *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (absence of objective medical evidence to support claimant's complaints). Specifically, the ALJ noted that the results of diagnostic studies were disproportionate to Plaintiff's alleged level of pain. Tr. 20. Despite Plaintiff's complaints of GERD and IBS, results of a January 2004 EGD revealed mild gastritis and moderate reflux esophagitis, for which she was treated conservatively with proton pump inhibitors. Tr. 14, 20, 131-133. Regarding her thrombocytosis, Plaintiff was treated conservatively with aspirin prophylaxis and regular monitoring of her blood counts. Tr. 20, 247; *see Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (an impairment is not considered disabling if it is adequately controlled with medication); *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) (objective signs did not measure up to severity of claimant's allegations when he only had "flare-ups" of pain and was conservatively treated with Tylenol). Moreover, the ALJ found that Plaintiff's failure to begin mental health counseling was inconsistent with her allegations of disabling depression. Tr. 16, 20; *Hutton,* 175 F.3d at 655 (claimant failed to maintain a consistent treatment pattern for her alleged mental impairments).

It is well-settled that an ALJ need not explicitly discuss each *Polaski* factor; it is "sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Strongson v. Barnhart*,

-18-

361 F.3d 1066, 1072 (8th Cir. 2004)).  Here, the ALJ cited the proper standard, considered the factors in conjunction with Plaintiff's testimony, and then properly discounted Plaintiff's subjective complaints.  *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("we defer to an ALJ's credibility determinations if they are supported by valid reasons and substantial evidence").  Accordingly, substantial evidence supports the ALJ's decision to discredit Plaintiff's subjective complaints.

## V.   <u>Conclusion</u>

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed.  Accordingly, Plaintiff's complaint should be dismissed with prejudice.

IT IS SO ORDERED this 12th day of September 2011.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE